UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

REYNOLDO RODRIGUEZ,
     Plaintiff,

v.                      Case No. 3:15-cv-01269
                              (RNC)


CITY OF DANBURY,
MARK BOUGHTON,
BERNARD MEEHAN,
TJ WIEDL, and
GEOFFREY HERALD,
     Defendants.

RULING AND ORDER

Plaintiff Reynoldo Rodriguez brings this action for damages and injunctive relief against the City of Danbury ("City"); Mark Boughton in his official capacity as the Mayor of Danbury; and Danbury Fire Department ("DFD") Deputy Chief Bernard Meehan, Chief TJ Wiedl, and former Chief Geoffrey Herald in their individual capacities. The complaint asserts Title VII claims against the City for a hostile work environment and disparate treatment based on sex, race, and national origin; a Monell claim under 42 U.S.C. § 1983 alleging Boughton's failure to take action to investigate, remedy and prevent discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment; and equal protection sex discrimination claims under § 1983 against Meehan, Wiedl, and Herald. Defendants have moved

for summary judgment.  For reasons stated below, the City's motion is granted and part and denied in part as to the claims under Title VII and granted as to the <u>Monell</u> claim; Meehan's motion is denied; and the motion submitted by Wiedl and Herald is granted.

I.  <u>Background</u>

The evidence in the record, construed in the light most favorable to plaintiff, shows the following. Plaintiff identifies as Hispanic of Puerto Rican descent. When he joined the DFD as a firefighter in July 1987, he was one of only a few minority employees.[1]  The DFD's structure is hierarchical, with defined chains of command. In 1987, plaintiff's chain of command was his Company Officer, his Captain, his Deputy Chief, the Assistant Chief, the Chief, and the Mayor.[2]  He also joined the union, the International Association of Firefighters Local 801 ("Union").

From the beginning of his career at the DFD, plaintiff was subjected to racial discrimination.  Lieutenant Stephen

---

[1] Prior to 1983, the DFD had never employed a woman or an African American man as a firefighter.

[2] Today, the chain of command places Assistant Chief second to Chief, with four Deputy Chiefs ranking below the Assistant.  Previously, the titles of Assistant and Deputy Chief were reversed, with Deputy Chief being the second-highest rank.  For consistency, I use the current titles to denote rank.

Omasta questioned whether plaintiff was "an affirmative action hire" and asked why the DFD could not "just give the job to a white guy."  Coworkers frequently called plaintiff "freakin' Puerto Rican."  Dave Bonner and Bob Vossburgh regularly suggested that plaintiff "go back to where [he] came from."  While none of these individuals was in plaintiff's chain of command, he reported the comments to his Company Officer, Lieutenant Carl Freundt, with no result.  When plaintiff asked Freundt if he should go directly to Human Resources ("HR") with his complaints, Freundt responded that it was better to keep such issues in-house.

Firefighter Lou DeMici served as Union president from around the time plaintiff was hired until sometime in the last few years.  DeMici "was a card-carrying racist" who frequently suggested that plaintiff and Steve Johnson, who is African American, form their own union.  DeMici repeatedly made the same statement to Steve Rogers, who is also African American.  Throughout his employment, DeMici regularly used racial slurs such as "spic," "nigger," "beaner," and "wetback."  Plaintiff complained about DeMici's comments to Freundt without result.

Rogers joined the DFD as a firefighter in 1999.  He recalls hearing racial slurs from the time he started,

including "nigger" and "eggplant," and regularly

overhearing homosexual slurs directed at plaintiff.

Individuals in the DFD also made comments to the effect

that Hispanic and black community members were "abusing the

system."

Sometime between 1987 and 1990, Ed Vacovetz told an

offensive joke about Puerto Ricans and skunks to plaintiff

in front of other crew members.  It is not clear if

Vacovetz was in plaintiff's chain of command at the time;

he was not in plaintiff's chain of command when plaintiff

was hired in 1987.  However, by July 1996, Vacovetz was

plaintiff's Deputy Chief.  Interpreting the facts in the

light most favorable to plaintiff, Vacovetz was in

plaintiff's chain of command at the time of this incident.

Around 1993, plaintiff applied for a lieutenant

position.  He ranked seventh on the eligibility list.[3]  The

first five people listed were eventually promoted.

Plaintiff suspected at least one of them was given an

unfair advantage, perhaps due to plaintiff's race.

However, he never complained internally about not being

promoted from the 1993 eligibility list.

---

[3] The parties agree the DFD follows a "rule of three" in
promotions: the Mayor has the option to appoint any of the
three highest-ranked candidates.

The 1993 list expired in May 1995. Another test was conducted in January 1996, which plaintiff did not pass. Accordingly, he was no longer eligible for a permanent promotion to lieutenant as of early 1996. Nevertheless, pursuant to the Union's Collective Bargaining Agreement, plaintiff became Acting Lieutenant in February 1996 when a temporary vacancy opened. However, he lost the position in July after the DFD manipulated rosters, moving vacancies to other crews so that other individuals would be promoted instead. The Union filed a grievance with the City on plaintiff's behalf. Additionally, in the fall of 1996, plaintiff filed a pro se complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC"). He alleged discrimination based on his race (Hispanic) and ancestry (Puerto Rican) when he lost the position of Acting Lieutenant in July 1996. He also referenced the previous hiring decisions based on the 1993 eligibility list.

After plaintiff filed the CHRO complaint, he was accused of "playing the race card" and severely ostracized. His peers would not eat with or talk to him. In one dangerous incident, plaintiff and others were fighting a fire when, without notifying plaintiff, the rest of the crew abandoned the house out of a fear it would collapse.

His peers' behavior caused plaintiff so much stress he could not sleep. Corporation counsel for the City gave plaintiff's personal phone number to a local newspaper. Reporters called plaintiff about the complaint, causing stress in his marriage. Ultimately, plaintiff "was just so beat down" that he dropped the complaint.

Plaintiff complained about the retaliation to his chain of command, including Deputy Chief Pechaski, Assistant Chief Peter Siecienski, and Chief Carmen Oliver. Siecienski told him the retaliation was the result of plaintiff's decision to "play the race card." Pechaski and Oliver simply encouraged plaintiff to get transferred to a different crew, which he did in March 1997. Even on his new crew, however, the situation was not much better; several firefighters, including Stephen Omasta and Rich Krikorian, continued to accuse him of "playing the race card." After plaintiff complained to Lieutenant Bobby Keenan, Keenan spoke to the crew and the situation appeared to improve somewhat. In May 1997, however, matters again took a turn for the worse. Plaintiff left a cup of tea on a table. When he later returned and drank the tea, he found someone had filled the cup with dish soap. Plaintiff became sick with vomiting, diarrhea, and a rectal bleed. He reported the issue to Pechaski and Keenan, who sent him

home.  Plaintiff had an anxiety attack and was ultimately hospitalized with severe depressive symptoms for several days.  He was diagnosed with major depression, which he attributes solely to the workplace harassment.  He reported the soap incident to his chain of command, but does not know if an investigation was ever performed, and no one followed up with him about it.  Nobody would admit to putting soap in the teacup  but Mike Brennan and Chip Daly told him they knew it was there.  Members of the DFD discussed the soap incident regularly and considered it a joke.  Daly coined the term "Retching Rey" as a nickname for plaintiff.

In March 1998, the Mayor appointed plaintiff to his current position, Emergency Medical Services ("EMS") Coordinator.  His new chain of command was the Assistant Chief, Chief, and Mayor.  Others had applied for the position, including Meehan and Mark Omasta, who are both white.  After plaintiff got the appointment, Meehan lashed out at him with ethnic insults. Meehan told plaintiff that he got the job because he's Hispanic and called him "Fidel."  Meehan also called him "angry Hispanic" many times.  At some point between 1999 and 2005, when plaintiff ran the Community CPR program, Meehan publicly called him a "CPR chimp."  Plaintiff attributes this behavior to

Meehan's anger that someone who was Hispanic got the EMS Coordinator job over him.

In the late 1990s, the discriminatory comments plaintiff experienced in the workplace shifted. Ethnic slurs continued but the comments were more often sexual in nature.[4] Plaintiff attributes the shift to his CHRO complaint, believing his coworkers thought they could not be accused of discrimination if they made homophobic, as opposed to racial, comments. The "constant barrage of homosexual taunts" included foul language such as "faggot," "queer," "homo," "rump rider," "cum guzzler," "dicky-licker," and "cocksucker" and statements that he "liked taking it in the ass." Plaintiff, who identifies as heterosexual, does not know if anyone actually perceived him to be homosexual. Rather, he reasons that because the DFD is "an alpha male society," the taunts were intended to "demean [him] as a human being, as a man" -- "to make [him] less than they are, to treat [him] less than they are." The terms were used by various firefighters whenever plaintiff entered a room. Plaintiff believes he was targeted because he "wasn't a manly man" and did not work

---

[4] There had been some homophobic comments previously, but they became very prevalent in the late 1990s.

on the front lines fighting fires after his promotion to EMS Coordinator.

In the late 1990s, Meehan began behaving in an inappropriately sexual manner toward plaintiff.  This included frequent attempts to hug or otherwise touch him -- including regular requests for what Meehan called "man hugs" -- as well as telling plaintiff he had "nice man boobs."  In one undated incident, Meehan grabbed plaintiff's pectorals from behind and ground his groin into plaintiff while saying "[y]ou got man boobs" and "I like you a lot."  This behavior was ongoing from 1998 until Chief Herald ordered Meehan to stop touching plaintiff in January 2014.  Plaintiff has not observed Meehan treat anyone else in the DFD this way.  Meehan's behavior undermined plaintiff's self-respect and "[t]he constant touching left [plaintiff] anxious around him."  Plaintiff does not know what Meehan's motivation was, sexual or otherwise.  Plaintiff complained verbally to Herald and Meehan about the behavior.

After September 11, 2001, plaintiff was placed in charge of the HazMat team.  This assignment required more duties than plaintiff should have had to perform as EMS Coordinator.  Many firefighters were angry that plaintiff was appointed to this role in place of Paul Omasta.  Soon

after his appointment, some people made comments that plaintiff "played the race card" to get the appointment, even though he did not apply for the position.

Positions in the DFD are divided between "staff" personnel (support personnel, such as the EMS Coordinator) and "line" personnel (those who fight fires and engage in other emergency operations). Staff positions do not carry rank, whereas line positions can have rank. Nevertheless, plaintiff believes that under the City's ordinances, the EMS Coordinator is entitled to rank -- perhaps the rank of lieutenant or deputy chief. He also believes having rank would entitle him to additional respect, making his job easier. Steve Rogers agrees. Plaintiff brought the rank issue to the attention of Chief Siecienski in 2005 and to Chief Herald in 2008, but staff positions are still not entitled to rank.

Plaintiff applied for the Drillmaster/Training Officer position in February 2006. Mark Omasta ranked first on the list of applicants, Kevin Plank second, and plaintiff third. Mayor Boughton appointed Omasta to the position. Plaintiff and Plank reviewed the tapes of the interviews of the applicants and the scoring sheet and concluded that scores had been changed in favor of Omasta. They challenged the outcome with the Civil Service Commission.

They were told the ranking did not matter because the Mayor wanted Omasta for the job. Plaintiff believes he was not hired for this position because of his race. Plank and Omasta are white.

As soon as Omasta became Drillmaster, he began wearing collar brass on his uniform displaying three bugles, which represents the rank of Deputy Chief. His action was in contravention of the regulations because the Drillmaster position does not have rank. The regulations instead permit the Drillmaster to wear a gold eagles insignia.

Herald became Chief in April 2007.[5] Shortly thereafter, he asked plaintiff to buy him lunch. After the meal, Herald began to drive aimlessly around Danbury before stopping at an abandoned property. Plaintiff felt very uncomfortable. Herald exited the car, stood in front of it facing plaintiff, exposed himself, and urinated.

In early November 2009, plaintiff discussed the issue of rank insignia with Chief Herald. Herald instructed plaintiff and communications coordinator Pat Sniffin to wear captain's bars. After plaintiff spent $500 to comply, Herald abruptly changed his mind and told plaintiff and

---

[5] He retired in 2014, at which point Wiedl became Chief.

Sniffin to take off the bars.  Omasta continued to wear the Deputy Chief bugles.

In late November 2009, plaintiff saw Herald talking to a woman at a bar.  The woman appeared annoyed with Herald's advances, so when Herald stepped away, plaintiff offered her a ride home, which she accepted.  Herald eagerly approached plaintiff the next day to discuss the incident and said, "Next time we can do a threesome."  Plaintiff thought Herald might have meant he wanted to have sex with plaintiff.

Meehan began calling plaintiff "half-a-day Rey" sometime after 2009.  Plaintiff understood this to be a racist term, implying Hispanics are lazy.  He complained verbally to Herald.  Many other firefighters adopted the term, and sometime between 2011 and 2015, Chief Herald repeated the phrase in front of the whole dispatch crew. He also used the term on other occasions, including in front of Steve Rogers.  Rogers testified there was a "running joke" that plaintiff was lazy, including that Herald would call plaintiff over the intercom at 4:55 PM to make sure he was still at work.

Meehan falsely complained to Herald about seeing plaintiff and Rogers' city vehicles in locations where they were not supposed to be around 2010 (plaintiff) and

sometime between 2011 and 2014 (Rogers).  Plaintiff believes these complaints were racially motivated because Meehan never complained about Omasta taking his vehicle home when he was Drillmaster.

In April 2011, plaintiff sought to resign as HazMat team leader because not having rank and being subjected to homophobic and ethnic slurs made it difficult to control a team of twenty-five men and because the HazMat duties were not in his job description as EMS Coordinator.  When he attempted to resign, he told Chief Herald his resignation was based in part on the homosexual slurs.  Herald did not accept plaintiff's or address his concerns, except to send an email regarding the lack of civility in the DFD in general.

By 2012 or 2013, Rogers perceived plaintiff to be a "beaten man" from "years of abuse" and from the lack of diversity in the DFD.  Around the same time, plaintiff found a life-sized inflatable sex doll left in his office.  Plaintiff brought it to Herald, who told him to dispose of it.  Herald told Wiedl to investigate who had placed the doll in plaintiff's office, but the responsible party was never identified.  Herald did not report the incident to HR.

On January 18, 2013, plaintiff, Meehan, Chief Herald, Assistant Chief Wiedl, and three Deputy Chiefs, among others, attended a staff meeting at City Hall. Meehan placed his feet in plaintiff's lap and touched his chest, tickling and stroking his nipple. Plaintiff reported this to Herald, who indicated via email he would address the issue with Meehan. Herald understood plaintiff to be alleging Meehan had touched him sexually. Nobody in attendance reported seeing the incident. However, Herald testified the staff meeting took place at a long table and he would not have been able to see what actually happened. In response to plaintiff's complaint, Herald directed plaintiff to stay away from Meehan and advised him to contact HR. Herald did not contact HR himself.[6]

---

[6] At one point in his deposition, Herald claimed he reported this incident to HR. However, he later stated he did not remember whether he notified HR, his impression was Wiedl took care of it, he did not know if Wiedl reported it to HR, and he did not recall subjecting Meehan to any discipline except perhaps to make him apologize to plaintiff. Later still, Herald said the incident "was handled in-house" and therefore he was not surprised HR's report about a later complaint in 2014 did not mention the 2013 incident. Wiedl claims Herald asked him to investigate the incident, he interviewed everyone present but nobody saw it occur, and he reported his findings to Herald. Plaintiff alleges he contacted HR regarding the incident and they interviewed him, but he does not know the outcome of the investigation. Interpreting the facts in the light most favorable to plaintiff, plaintiff's superiors did not notify HR of the 2013 incident and HR did

14

On February 6, 2013, plaintiff emailed Chief Herald to say he was interested in attending a training. Herald responded, copying Wiedl. He wrote that if plaintiff did not provide his supervisor with specifics as to why he wanted to attend the training, "there is a very high probability that the supervisor will deny the request and not allow you to attend any activities beyond the tiny squalid office you inhabit. That is what I would do. Just saying." Herald stated in his deposition the "supervisor" was Herald himself. Plaintiff understood the email's reference to "the tiny squalid office [he] inhabit[s]" to be a discriminatory comment based on his race or national origin.

Over the years, plaintiff submitted written complaints to members of his chain of command complaining about how others were treating him, including that firefighters were acting up in his training classes. However, none of those complaints mentioned protected characteristics such as race, sex, or national origin. Rather, they often attributed the harassment to ill will between staff personnel and line personnel or to plaintiff's lack of rank. Plaintiff explains he did not allege discrimination

_____

not adequately investigate when plaintiff reported it himself.

based on protected characteristics due to the severe ostracization he faced for "playing the race card" when he filed the 1996 CHRO complaint. Several of the complaints were investigated within the DFD or by HR.[7]

Plaintiff filed a CHRO complaint on April 17, 2013. The complaint alleged he was harassed, discriminated against in the terms and conditions of his employment, and subjected to a hostile work environment based on his national origin.

Meehan continued to touch plaintiff inappropriately around once a month in 2013. This touching included groping plaintiff's chest as well as grabbing plaintiff from behind and pretending to have sex with him. On January 6, 2014, Meehan entered plaintiff's office and stated he needed a "man hug." Plaintiff told Meehan not to come behind his desk and put his leg up to block Meehan's path. Meehan straddled plaintiff's leg and repeatedly

---

[7] The record suggests plaintiff made such written complaints sometime in the 1980s and in 1998, February 2000, January and October 2001, February and June 2002, March 2005, June 2011, July 2013, and June 2014. The record also includes complaints from Rogers in 2014 and 2016 that do not specifically allege racial discrimination. HR investigated Rogers's 2014 complaint and both HR and a neutral third party investigated the 2016 complaint. The complaints could not be substantiated. This 2016 complaint is not to be confused with the 2016 complaint regarding Meehan's comment about Puerto Ricans, discussed below.

humped it.  Rogers overheard this incident, as his office

was next door to plaintiff's.[8]  He heard plaintiff say "get

off me" repeatedly and "a bunch of tussling" which "sounded

like a fight."  Immediately after the incident, plaintiff

came to Rogers's office and told him what happened.  Rogers

advised plaintiff to report Meehan's behavior, but

plaintiff said it would be useless to do so.  Rogers

decided to report the incident himself.  When he told Chief

Herald and Assistant Chief Wiedl that Meehan had humped

plaintiff's leg, Herald and Wiedl responded in unison,

"Again?"  When Rogers asked for clarification, Herald said

that Meehan "just likes touching" plaintiff, that Herald

had gotten complaints about Meehan touching plaintiff, and

that Meehan was "never going to learn."  When Rogers told

Herald to report the incident to HR, Herald said they would

"handle this in-house."  Rogers then threatened to write a

letter to HR himself, after which Herald agreed to report

the incident to HR.

On January 7, 2014, plaintiff walked into the fire

station and saw Meehan sitting in a chair.[9]  In front of the

---

[8] Rogers also testified that Meehan humped Rogers in a
similar manner a few years earlier, perhaps in early 2011.
Rogers never reported that incident.
[9] Plaintiff says this occurred the day after the nipple-
stroking incident in 2013, or soon thereafter.  Virginia
Alosco-Werner, HR Director for the City, says plaintiff

crew, Meehan rolled his chair over to plaintiff and tried to grope plaintiff's groin.

Plaintiff reported the leg-humping incident to Chief Herald in writing on January 8. He wrote, "This made me feel very uncomfortable and this is not the first time [Meehan] has behaved in this manner towards me and I want it to stop!" He also recalls reporting the January 7 incident to Herald. On January 9, Rogers wrote to Herald that he "heard [Meehan] attack [plaintiff] the other day."

HR investigated both the January 6 and January 7 incidents, including interviewing plaintiff and Rogers. HR concluded in March 2014 that it could not corroborate plaintiff's allegations. Nevertheless, Meehan was required to participate in the Employee Assistance Program ("EAP"). Meehan has not touched plaintiff inappropriately since January 2014.

Rogers received the highest score on the Drillmaster promotional examination and was sworn into the position in April 2015. People told Rogers they were disappointed the Drillmaster position did not go to another firefighter. Chief Wiedl tried to get Rogers to take a position in the

---

told her this occurred the day after the leg-humping incident in 2014. In any event, it occurred in January 2013 or January 2014 and was investigated with the leg-humping incident in 2014.

fire marshal's office rather than the Drillmaster position.
When the Drillmaster promotional examination results were
posted on a whiteboard, showing that Rogers received by far
the highest score, someone wrote on the board, "Where's the
REAL list?!"  Rogers overheard individuals saying he "got
black points" in his promotion and asking how "a person
like him" could "be that smart."  Though Omasta had worn
the three-bugles insignia for years as the Drillmaster, as
soon as Rogers became Drillmaster and wore the same
insignia, Wiedl told him to remove it.

In 2015 or 2016, Karl Drentwet referred to plaintiff
"sucking penis" and made other homophobic comments to
plaintiff.  Also in 2015 or 2016, plaintiff was in the DFD
shower when another firefighter entered the shower and
disrobed.  The shower has a single working shower head, so
only one person can shower at a time.  Plaintiff did not
think the firefighter was making a sexual advance toward
him, but he got nervous and left.  He did not complain
about the incident.  The new Union president, Jeffrey
Tomchik, made comments the next day about plaintiff and the
other firefighter being in the shower together.  In the
same time frame, Rogers heard Meehan say plaintiff got the
EMS Coordinator job to fill a quota because he is Puerto
Rican.

On April 25, 2016, Meehan commented to Rogers and Johnson, "You can't trust those Puerto Ricans." Rogers submitted a complaint about the comment in May. Meehan denied making the statement. After Johnson corroborated Rogers' complaint, Chief Wiedl suspended Meehan for three days. However, the suspension was rescinded after Johnson recanted in July 2016. The City hired a third-party investigator, who could not substantiate Rogers's allegation.

Plaintiff estimates that during his employment with the DFD, he has been referred to as "homo" thousands of times; "spic," "rump rider," and "cum guzzler" hundreds of times each; "wetback" and "dicky-licker" dozens of times each; and "freakin' Puerto Rican" a dozen times. He also estimates people have stated he "like[s] to take it up the ass" hundreds of times.

In 2016, plaintiff's expert psychologist diagnosed him with moderate recurrent episodes of major depressive disorder. Plaintiff was not symptomatic as of 2016 due to positive changes in his personal life. However, the diagnosis of recurrent episodes of major depression applied to the preceding twenty-five years.

II. <u>Legal Standard</u>

"Summary judgment is proper only when, construing the

evidence in the light most favorable to the non-movant,
'there is no genuine dispute as to any material fact and
the movant is entitled to judgment as a matter of law.'"
Doninger v. Niehoff, 642 F.3d 334, 344 (2d Cir. 2011)
(quoting Fed. R. Civ. P. 56(a)).  To avoid summary
judgment, the plaintiff must point to evidence that serves
to raise a genuine dispute of material fact; conclusory
allegations, unsubstantiated speculation, or inadmissible
evidence do not suffice.  See F.D.I.C. v. Great Am. Ins.
Co., 607 F.3d 288, 292 (2d Cir. 2010); Ehrens v. Lutheran
Church, 385 F.3d 232, 235 (2d Cir. 2004).  Moreover, "[t]he
mere existence of a scintilla of evidence in support of the
[non-movant's] position" is not enough to prevent summary
judgment.  Anderson v. Liberty Lobby, 477 U.S. 242, 252
(1986).

"[A]dditional considerations should be taken into
account" when reviewing a motion for summary judgment in a
discrimination case.  Gallo v. Prudential Residential
Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).  In
particular, "[a] trial court must be cautious about
granting summary judgment to an employer when . . . its
intent is at issue."  Id.  Nevertheless, "trial courts
should not 'treat discrimination differently from other
ultimate questions of fact.'"  Reeves v. Sanderson Plumbing

Prods., Inc., 530 U.S. 133, 148 (2000) (quoting St. Mary's

Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993)).  Thus,

"[e]ven in the discrimination context . . . , a plaintiff

must provide more than conclusory allegations to resist a

motion for summary judgment."  Holcomb v. Iona Coll., 521

F.3d 130, 137 (2d Cir. 2008); see also Abdu-Brisson v.

Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001)

("It is now beyond cavil that summary judgment may be

appropriate even in the fact-intensive context of

discrimination cases.").

III. Analysis

    A. Hostile Work Environment

        Plaintiff alleges that from the beginning of his

employment in 1987 until he filed his complaint in this

action, members of the DFD subjected him to a hostile work

environment based on his race or national origin and his

sex in violation of Title VII.  The City seeks summary

judgment on the grounds that plaintiff failed to exhaust

administrative remedies with regard to his allegations,

most of his allegations are untimely under the statute of

limitations, and the timely allegations do not provide a

basis for a jury to return a verdict in his favor.

        To prevail on his Title VII hostile work environment

claim, plaintiff must show that (1) the workplace at DFD

22

was permeated with discriminatory intimidation sufficiently severe or pervasive to alter the conditions of his work environment and (2) a basis exists for imputing the conduct that created the hostile environment to the City. See Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 106 (2d Cir. 2011). "Where reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law." Patterson v. Cty. of Oneida, 375 F.3d 206, 227 (2d Cir. 2004).

As with any Title VII claim, plaintiff must prove that the hostility he experienced was "because of" a protected characteristic such as race, national origin, or sex; Title VII is not a "general civility code for the American workplace." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998); see also 42 U.S.C. § 2000e-2(a).

Racist jokes and comments, sexually harassing behavior, and homophobic or sex-stereotyping comments may contribute to a hostile work environment. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997). This is true even when plaintiff did not hear the comments. Id. at 111 ("The mere fact that [plaintiff] was not present when a

racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim. . . . [T]he fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor . . . can impact the work environment.").

Furthermore, comments directed at Steve Rogers or others may be relevant to the analysis. See Williams v. Consol. Edison Corp. of N.Y., 255 F. App'x 546, 549 (2d Cir. 2007) ("Because a hostile work environment claim 'focuses on the nature of the workplace environment as a whole,' evidence of racial and sexual harassment and hostility beyond what is directed specifically at the plaintiff is relevant to our analysis."); Petrosino v. Bell Atl., 385 F.3d 210, 222 (2d Cir. 2004) ("The fact that much of this offensive material was not directed specifically at [plaintiff] . . . does not, as a matter of law, preclude a jury from finding that the conduct subjected [her] to a hostile work environment based on her sex."); Schwapp, 118 F.3d at 112 (including comments that did not pertain to plaintiff's own minority group in the hostile work environment analysis).

## 1. Exhaustion of Administrative Remedies

Plaintiff's CHRO/EEOC complaint specifically referred to the protected characteristic of national origin only.

The City contends that, as a result, his hostile work environment claim cannot be founded on sex-based harassment.[10]  I conclude that plaintiff may rely on incidents of sex-based harassment to prove his claim.

 "[P]recise pleading is not required for Title VII exhaustion purposes." Deravin v. Kerik, 335 F.3d 195, 202 (2d Cir. 2003) (citing Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll., 848 F.2d 457, 460 (4th Cir. 1988)). Rather, "[i]t is the substance of the charge and not its label that controls." Id. at 201 (quoting Alonzo v. Chase Manhattan Bank, N.A., 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998)).

Claims not raised in an EEOC complaint may be brought in federal court if they are "reasonably related" to the claims presented to the agency.  Williams v. N.Y.C. Hous. Auth., 458 F.3d 67, 70 (2d Cir. 2006).  Claims are "reasonably related" for this purpose "if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made."  Id. (quoting Fitzgerald v. Henderson, 251 F.3d 345, 359-60 (2d Cir. 2001)).

Plaintiff's EEOC/CHRO complaint –- which he reportedly

---

[10] Defendant does not argue plaintiff's claims based on race are administratively barred.

prepared himself -- stated that he had "been called homophobic names, verbally abused, assaulted by a coworker and . . . had signs left on my office door for the 'girls' bathroom" and "for the 'secretary' and 'custodian.'"  At the same time, however, he explicitly noted he "believe[d] this harassment occurred because [he is] Hispanic." Similarly, the complaint described the 2013 incident when Meehan stroked plaintiff's chest, but also noted that Meehan and Herald are white, implying the incident occurred and was not properly investigated because of his national origin.[11]

I think plaintiff's complaint was sufficient to give the EEOC and CHRO "adequate notice to investigate discrimination" based on both national origin (or race) and sex, notwithstanding plaintiff's own representations that these incidents occurred because he is Hispanic. The complaint alleged a hostile work environment, which can be based on multiple protected characteristics.  And, as just discussed, it provided numerous examples of discriminatory conduct relating to sex, not just national origin.

Accordingly, instances of sex-based harassment may be used to support plaintiff's claim.  See Zarda v. Altitude

---

[11] Plaintiff filed this complaint in April 2013, before the 2014 leg-humping incident.

<u>Express, Inc.</u>, 883 F.3d 100, 110-11 & n.5 (2d Cir. 2018)

(en banc) ("Because Zarda's charge gave the [EEOC] adequate

notice to investigate discrimination on both [the basis of

sexual orientation and of gender], it is irrelevant whether

Zarda's EEOC complaint unequivocally alleged sexual

orientation discrimination." (internal quotation marks

omitted)), <u>cert. granted</u>, 139 S. Ct. 1599 (2019);

<u>Williams</u>, 458 F.3d at 71 (holding sex discrimination claim

to be reasonably related to retaliation claim in EEOC

complaint where plaintiff did not check the box for "sex"

in her EEOC complaint, but did include factual allegations

consistent with sex discrimination). <u>Cf.</u> <u>Collins v. Univ.</u>

<u>of Bridgeport</u>, 781 F. Supp. 2d 59, 64 (D. Conn. 2011)

(finding claims of discrimination in a place of public

accommodation barred where plaintiff's CHRO complaint only

suggested employment discrimination).

### 2. Statute of Limitations and Merits

The City argues that plaintiff's hostile work

environment claim is largely barred by Title VII's

limitations period.  Because this question implicates the

merits, I review the statute of limitations and merits

together.

### i. Statute of Limitations

As pertinent here, Title VII requires filing a charge

with the EEOC "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). The parties agree plaintiff filed his EEOC complaint on April 17, 2013; three hundred days earlier was June 21, 2012. Therefore, the City argues, plaintiff cannot rely on any conduct before that date in bringing his hostile work environment claim.

The Supreme Court's decision in National Railroad Passenger Corp. v. Morgan is instructive on the meaning of § 2000e-5(e)(1). See 536 U.S. 101 (2002). The Court asked, for both discrete discriminatory acts and hostile work environment claims, "What constitutes an 'unlawful employment practice' and when has that practice 'occurred'?" Id. at 110. For "discrete" acts, the answer was simple: the act "'occurred' on the day that it 'happened.'" Id. Such acts "are not actionable if time barred, even when they are related to acts alleged in timely filed charges," though an employee may "us[e] the prior acts as background evidence in support of a timely claim." Id. at 113. Additionally, "[d]iscrete acts of this sort, which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." Chin v. Port

Auth. of N.Y. & N.J., 685 F.3d 135, 157 (2d Cir. 2012).

Some of the discriminatory acts alleged in this case are time-barred as discrete employment practices that occurred before June 21, 2012. These include the failure to promote plaintiff in the 1990s and in 2006; any claims that his complaints before June 21, 2012 were not properly investigated; denial of rank and of the ability to wear rank insignia, which can be construed as a failure to promote; and Herald's denial of plaintiff's attempt to resign from his HazMat responsibilities in April 2011. See Morgan, 536 U.S. at 114 (failure to promote and denial of transfer); Rogers v. Fashion Inst. of Tech., No. 14-CIV-6420 (AT), 2016 WL 889590, at *4 (S.D.N.Y. Feb. 26, 2016) (failure to investigate); Gilbert v. Levy, No. 00-CIV-2675 (TPG), 2005 WL 1870964, at *3 (S.D.N.Y. Aug. 8, 2005) (same).

The timeliness of hostile work environment claims is more complex because "[t]heir very nature involves repeated conduct." Morgan, 536 U.S. at 115. "The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and . . . a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts." Id. Accordingly,

under Title VII, "[i]t does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id. at 117. This is true even if there is a substantial gap in the incidents, as long as they constitute a single "unlawful employment practice." Id. at 118; see also Staten v. City of New York, 726 F. App'x 40, 43 (2d Cir. 2018) (holding that claims that would otherwise be time-barred may proceed when they "collectively constitute one unlawful employment practice"). This framework is referred to as the continuing violation doctrine. Kimball v. Vill. of Painted Post, 737 F. App'x 564, 568 (2d Cir. 2018).

For the continuing violation doctrine to apply, the acts must be "part of the same actionable hostile work environment practice." Morgan, 536 U.S. at 120. "[I]f an act [within the limitations period] had no relation to the [earlier] acts" or was otherwise "no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts" by reference to an act within the limitations period. Id. at 118. "Separate acts

are not properly treated as part of a single hostile work environment practice if they are 'qualitatively different' from one another." <u>Kimball</u>, 737 F. App'x at 568.  Rather, the acts must be "sufficiently related." <u>McGullam v. Cedar Graphics, Inc.</u>, 609 F.3d 70, 77 (2d Cir. 2010).

Factors to consider in determining whether separate acts are part of a single practice include: "whether the timely and untimely harassment is of a similar nature," "whether the same individuals perpetuated the harassment," "the frequency and temporal proximity of the acts," and "whether the employer took any intervening remedial action." <u>Annunziata v. Int'l Bhd. of Elec. Workers Local Union # 363</u>, No. 15-CV-03363 (NSR), 2018 WL 2416568, at *13 (S.D.N.Y. May 29, 2018); <u>see</u> <u>also</u> <u>id.</u> (collecting cases).

In <u>Morgan</u>, the Supreme Court held that pre- and post-limitations period incidents were "part of the same actionable hostile environment claim" when they "involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." 536 U.S. at 120 (internal brackets omitted).  In <u>Kimball</u>, by contrast, the Second Circuit found that certain pre-limitations-period incidents could not contribute to a hostile work environment claim because they differed significantly in nature from the incidents within the

31

limitations period.  737 F. App'x at 568.

The record contains evidence of the following incidents in support of plaintiff's hostile work environment claim:[12]

(1) Racist comments from Stephen Omasta, Bonner, and Vossburgh in the late 1980s;
(2) DeMici's racist comments, beginning in the late 1980s and continuing until DeMici retired within the last few years;
(3) Vacovetz's racist joke in the late 1980s;
(4) Coworkers leaving plaintiff in a burning building in the late 1990s;
(5) Corporation counsel giving plaintiff's phone number to a local newspaper in 1996;
(6) Retaliation from coworkers after the 1996 complaint, including not eating with or talking to plaintiff and telling him he was "playing the race card";
(7) Siecienski telling plaintiff he had "played the race card" in 1997;
(8) The 1997 soap incident;
(9) Meehan's racist comments to plaintiff between 1998 and 2009;
(10) Meehan's constant touching of plaintiff beginning in

---

[12] This list includes only some of the facially neutral incidents described in the facts above.  "Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex.  But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory."  Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002).  I have included some facially neutral incidents that arguably were in fact based on a protected characteristic.  However, for some incidents, such as plaintiff's many complaints about workplace disputes that did not suggest any connection to a protected characteristic, the record contains insufficient evidence from which a reasonable jury could infer that the events involved prohibited discrimination.  In any event, the record also demonstrates that many of those complaints were sufficiently investigated.

the late 1990s and continuing until January 2014;

(11) Comments from coworkers in 2001 that plaintiff was "playing the race card";

(12) The urination incident with Herald in 2007;

(13) The "threesome" comment by Herald in 2009;

(14) Meehan's report about plaintiff's vehicle around 2010;

(15) Meehan's use of the term "half-a-day Rey" beginning in 2009;

(16) Herald's use of the term "half-a-day Rey" sometime between 2011 and 2015 and his propensity to call plaintiff on the intercom at 4:55 PM;

(17) Meehan's report about Rogers's vehicle sometime between 2011 and 2014;

(18) The sex doll being left in plaintiff's office in 2012 or 2013;

(19) Meehan stroking plaintiff's nipple in January 2013;

(20) Herald's "tiny squalid office" email in February 2013;

(21) Meehan humping plaintiff's leg in January 2014;

(22) Meehan attempting to grope plaintiff's groin in January 2014;

(23) Racist comments Rogers faced when he was appointed Drillmaster in April 2015;

(24) Homophobic jokes and comments plaintiff received from Drentwet and Tomchik in 2015 and 2016;

(25) Meehan's "quota" comment in 2015 or 2016;

(26) Meehan's comment about Puerto Ricans in 2016; and

(27) Unspecified coworkers' undated usage of various epithets against plaintiff, Rogers, and others.

The first step in analyzing plaintiff's claim is to determine which of these acts occurred within the limitations period -- that is, on or after June 21, 2012. McGullam, 609 F.3d at 76 - and whether any of them can be imputed to the City. E.g., Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir. 2009). With regard to the latter issue, the analysis differs depending on whether the conduct is

attributable to a supervisor or a coworker.[13]

"An employer is presumptively liable" for harassment "by someone with supervisory (or successively higher) authority over the plaintiff," subject to an affirmative defense under Faragher v. City of Boca Raton and Burlington Industries, Inc. v. Ellerth.  Redd v. N.Y. Div. of Parole, 678 F.3d 166, 182 (2d Cir. 2012) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)).  The Faragher/Ellerth defense has "two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Id. (quoting Ellerth, 524 U.S. at 765); see also Faragher, 524 U.S. at 807.

When harassment is attributed to a coworker, the employer is liable only for its own negligence.  Duch, 588

---

[13] The Supreme Court has provided guidance for determining whether an employee is a "supervisor" or an "employee." See Vance v. Ball State Univ., 570 U.S. 421, 424 (2013). However, defendants have not challenged supervisory liability for any individual.  Accordingly, I assume anyone in plaintiff's chain of command is subject to supervisory liability.

F.3d at 762.  Plaintiff may demonstrate that the City was
negligent by showing (1) that it failed to provide a
reasonable avenue for complaint, or (2a) that it knew, or
in the exercise of reasonable care should have known, about
the harassment yet (2b) failed to take appropriate remedial
action.  Id. (citing Howley v. Town of Stratford, 217 F.3d
141, 154 (2d Cir. 2000)).

Here, acts within the limitation period that are
attributable to a supervisor are Herald's actions of using
the term "half-a-day Rey," calling plaintiff on the
intercom at 4:55 PM, and sending him an email referring to
his "tiny squalid office" (#16, #20).[14]  A reasonable jury
could find that each of these acts has ethnic undertones
and I cannot say they were "too trivial to contribute to a
Title VII hostile work environment claim."  McGullam, 609
F.3d at 76 (citing Burlington N. & Santa Fe Ry. Co. v.
White, 548 U.S. 53, 68 (2006)).

The City contends it is entitled to a Faragher/Ellerth
defense with regard to Herald's actions.  This argument is
unavailing.  The City may be able to satisfy the first

---

[14] While plaintiff claims that Meehan -- who is not in his
chain of command -- has supervisory authority over him, the
record does not support that claim.  Meehan's rank is what
is now known as Deputy Chief.  The organizational charts
provided by both parties demonstrate that this role is at
the same level as the EMS Coordinator role, not above it.

prong of the defense.[15]  However, as to the second prong,

plaintiff argues he did not raise claims of race

discrimination after 1996 because of the retaliation he

experienced after filing his CHRO complaint in 1996.  He

presents significant evidence of that retaliation in the

form of his and Rogers' testimony.  Thus, there is a

material issue of fact as to whether plaintiff had "a

credible fear that [his] complaint would not be taken

seriously or that [he] would suffer some adverse employment

action as a result of filing a complaint."  Leopold v.

Baccarat, Inc., 239 F.3d 243, 246 (2d Cir. 2001).

Accordingly, the acts attributable to Herald within the

limitations period may be considered as part of a hostile

_____

[15] An employer can generally satisfy the first prong by
demonstrating it had an antiharassment policy in place that
provided a reasonable complaint procedure.  Ferraro v.
Kellwood Co., 440 F.3d 96, 102 (2d Cir. 2006).  The City
has had a sexual harassment policy since at least 1986 and
currently has an "Anti-Harassment Policy and Complaint
Procedure" for its employees.  The most recent version of
the policy in the record states it is intended to prevent
discrimination and harassment based on various categories
including race, national origin, gender, and sexual
orientation.  The policy prohibits verbal taunting, racial
or ethnic slurs, and sexual harassment, and it provides a
complaint procedure.  Under the policy, "[a] person who
feels harassed, discriminated or retaliated against may
initiate the complaint process by filing a written and
signed complaint with the Personnel Director."
Additionally, a supervisor who becomes aware of harassment
or discrimination "should immediately report it to the
Personnel Director."

work environment claim.

With regard to coworker harassment, plaintiff cannot satisfy his burden for most of the discriminatory conduct attributable to his coworkers.  The City provided a reasonable avenue for complaint through its antiharassment policy.  With regard to some of the discriminatory conduct involving coworkers, there is no evidence the City knew or should have known about the harassment.  For example, as to the claim about Rogers' vehicle (#17), while plaintiff believes Meehan's complaints were racially motivated, no such complaint was made to the City.  There is no reason why Herald, on receiving Meehan's complaint, should have intuited the complaint was racially motivated and disciplined Meehan accordingly.  In any event, Rogers testified that Herald called Meehan a liar with regard to his complaint about Rogers' car and that Herald told Meehan his behavior was "unacceptable" and "unprofessional." Meehan's action cannot be attributed to the City.[16]

With regard to the racism Rogers was subjected to in 2015 (#23), the homophobic statements by Drentwet and Tomchik in 2015 and 2016 (#24), and Meehan's comment in 2015 or 2016 that plaintiff got the EMS Coordinator job

---

[16] The same analysis applies to Meehan's complaint about plaintiff's vehicle (#14).

because he is Puerto Rican (#25), the record does not suggest the City knew or should have known about the behavior, with one exception: Rogers testified about one instance when Drentwet made unspecified "inappropriate" comments that Rogers brought to the attention of Drentwet's senior officer.  However, Rogers also testified the officer addressed the issue.

As to nearly all the remaining incidents occurring after June 21, 2012, the record shows that DFD or HR investigated the claims and took appropriate remedial action.  This is true for the sex doll incident (#18), the leg-humping incident (#21), the groping incident (#22), and the comment about not trusting Puerto Ricans (#26).  In many cases, the investigation included interviews of witnesses and a written report.  Plaintiff characterizes these investigations as "shams," but provides no evidence to support his conclusory assertions.[17]

Other acts of coworkers within the limitations period are Meehan's use of the term "half-a-day Rey" (#15), the nipple-stroking incident (#19), and the general background of derogatory comments directed at plaintiff and others

---

[17] Plaintiff submits complaints that other individuals, nearly all of whom worked in other departments, filed against the City in 2007 and 2008.  Plaintiff makes no effort to explain why those investigations were inadequate.

(#27).[18] Herald was aware of the term "half-a-day Rey," as he used it himself.  Interpreting the evidence in the light most favorable to plaintiff, Herald was aware Meehan and others also called plaintiff "half-a-day Rey" but failed to do anything to remedy the problem.  Plaintiff complained to Herald that Meehan stroked his nipple, but Herald did not contact HR.  Furthermore, Rogers testified that individuals of higher ranks were aware of pervasive racist commentary against Hispanics and were only "beginning to" address it. The City's antiharassment policy states a supervisor "should immediately report" harassment or discrimination to HR upon becoming aware of it.  Herald's failure to do so with regard to the "half-a-day Rey" nickname and the nipple-stroking incident, and supervisors' previous apathy regarding racist comments, constitute "evidence tending to show that the [City's] response was inadequate." Distasio v. Perkin Elmer Corp., 157 F.3d 55, 65 (2d Cir. 1998).

Accordingly, the following conduct within the limitations period may be imputed to the City: Herald and Meehan's use of the term "half-a-day Rey"; Herald's

---

[18] It is not clear whether plaintiff reported Meehan's touching of him during the limitations period (part of #10) other than his reports with regard to the specific instances detailed above.  However, the record does show that plaintiff complained to Herald about Meehan touching him at some point.

repeated act of calling plaintiff at 4:55 PM over the intercom to make sure he was still in the office; Meehan stroking plaintiff's nipple in January 2013; Herald's "tiny squalid office" email in February 2013; and frequent racist comments.

The foregoing conduct, like the pre-limitations period conduct, includes verbal and physical abuses related to both race or national origin as well as sex discrimination.[19]  However, the similarity of the abuses is only one factor to consider in determining if the challenged acts all constitute a single hostile work environment.  As noted above, other factors include the individuals involved, the frequency of the acts, temporal proximity, and whether the employer took any intervening remedial action.  Much of the pre-limitations period

---

[19] Though plaintiff has alleged conduct on the basis of both race and sex within the limitations period, even if he had alleged conduct related to only one protected characteristic during this period, it would be sufficient. See Williams, 255 F. App'x at 549 n.1 (allowing hostile work environment claim based on both race and sex to proceed where a gender-based incident had occurred during the limitations period); see also Cruz v. Coach Stores, Inc., 202 F.3d 560, 572 (2d Cir. 2000) ("Given the evidence of both race-based and sex-based hostility, a jury could find that Bloom's racial harassment exacerbated the effect of his sexually threatening behavior and vice versa."), superseded by statute on other grounds as stated in Johnson v. IAC/Interactive Corp., 2 F. Supp. 3d 504, 516 (S.D.N.Y. 2014).

conduct must be eliminated based on these factors.

The comments by Bonner, Vossburgh, and Vacovetz (#1, #3) were made in the late 1980s -- more than twenty years before the limitations period -- and there are no allegations about their conduct thereafter.  Because the comments were made decades before the limitations period by individuals who engaged in no harassment during the limitations period, they cannot contribute to the same hostile work environment as acts within the limitations period.  The same is true for the comment that plaintiff was "playing the race card," which Siecienski, Omasta, Krikorian, and others made in the late 1990s and 2001 (#6, #7, #11).  The corporation counsel appears only once in the record; moreover, his action in the late 1990s (#5) was remote in time and different in kind from any other challenged act.  The 1990s incidents in which unspecified coworkers placed plaintiff in physical danger by putting soap in his drink (#8) and abandoning him in a burning building (#4) are significantly different in kind from the post-limitations period incidents, as well as temporally distant.  Finally, coworkers' actions of not eating or talking to plaintiff after his 1996 complaint (#6) are also temporally distant and there is no allegation of anything similar during the limitations period.

Remaining from the pre-limitations period are the racist comments from DeMici (#2) and Meehan (#9) as well as Meehan's acts of touching plaintiff (#10) and Herald's possible sexual harassment of plaintiff in 2007 (#12) and 2009 (#13). Conduct may contribute to a hostile work environment only when it can be imputed to the City. The record does not suggest that either DeMici or Meehan has ever been plaintiff's supervisor, so the question is whether the City knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.

The record suggests plaintiff complained about DeMici's comments and Meehan's physical behavior, with no result. It does not suggest, however, that he complained about Meehan's racist comments from the pre-limitations period. Accordingly, the only pre-limitations period conduct that may be considered as part of the hostile work environment claim are DeMici's comments beginning in the 1980s and Meehan's touching of plaintiff beginning in the 1990s.[20]

---

[20] The City argues that even if acts before the limitations period may be considered, any claim based upon acts before 1997 is time-barred because plaintiff filed a claim with the EEOC and CHRO in 1996 but did not file suit within ninety days of receiving the EEOC's release-of-jurisdiction notice, as required by Title VII. 42 U.S.C. § 2000e-

ii.  <u>The Merits</u>

As a result of the foregoing analysis, the
discriminatory conduct that forms the basis for plaintiff's
hostile work environment claim consists of the following:
DeMici's comments beginning in the 1980s; Meehan's touching
of plaintiff beginning in the 1990s, except the specific
instances eliminated above; Herald's conduct with regard to
the urination incident and threesomes; Herald and Meehan's
use of the term "half-a-day Rey"; Herald's repeated act of
calling plaintiff at 4:55 PM over the intercom to make sure
he was still in the office; Meehan stroking plaintiff's
nipple in January 2013; Herald's "tiny squalid office"
email in February 2013; and general racist comments.

The next step in the analysis is to assess whether the
foregoing conduct was sufficiently severe or pervasive as
to alter the conditions of plaintiff's employment.  Factors
to consider include the frequency of the conduct; its

---

5(f)(1).  However, in such circumstances, only claims
identical to those named in the original complaint are
barred.  <u>See</u> <u>Melie v. EVCI/TCI Coll. Admin.</u>, 374 F. App'x
150, 152 (2d Cir. 2010) (citing <u>Soso Liang Lo v. Pan Am.</u>
<u>World Airways, Inc.</u>, 787 F.2d 827, 828 (2d Cir. 1986) (per
curiam)).  In this case, plaintiff's 1996 complaint related
to discrimination in his loss of the position of Acting
Lieutenant and mentioned he had previously been incorrectly
denied opportunities for promotion. Such allegations are
excluded from his hostile work environment claim because
they constitute discrete acts.  No other claims are barred
by the 1996 complaint.

severity; whether it was physically threatening or humiliating, and whether it unreasonably interfered with plaintiff's work performance.  Weighing these factors, I think a reasonable jury find that the conduct at issue was sufficiently severe and pervasive as to alter the conditions of plaintiff's employment.[21]

     With regard to physical conduct, plaintiff has testified the Meehan's actions were frequent.  His actions may have been physically threatening, and they were certainly humiliating.  His actions interfered with plaintiff's work performance: plaintiff testified the touching made him anxious around Meehan.  Herald's conduct in connection with the urination incident could be veiwed by the jury as demeaning.  Plaintiff has testified that it made him uncomfortable, as did Herald's reference to a threesome.

     The remaining conduct involves "mere offensive utterance[s]."  Id.  Nevertheless, they appear to have been

_____

[21] Importantly, though the other challenged acts discussed above cannot contribute directly to the hostile work environment, they can still be considered as background when interpreting the evidence to determine whether it supports a hostile work environment.  See Morgan, 536 U.S. at 113 (holding that Title VII does not "bar an employee from using . . . prior acts as background evidence in support of a timely claim"); Distasio, 157 F.3d at 62 (holding unreported conduct may be considered as part of "the totality of the circumstances" in determining whether a hostile work environment existed).

frequent.  DeMici's statements included unambiguous racial slurs.  While Herald and Meehan's comments are not as clear, taking into account the background evidence of racial slurs to which plaintiff and Rogers had been subjected, a reasonable jury could find their comments carried unmistakably discriminatory meaning.  A reasonable jury could find the racial and ethnic slurs interfered with plaintiff's work performance by causing depression.  Accordingly, plaintiff's hostile work environment claim on the basis of race and national origin may proceed.

B.  Sexual Harassment

Plaintiff claims that Meehan's repeated touching of him over many years violated his right to equal protection under the Fourteenth Amendment because it created a sexually hostile work environment.  Plaintiff further claims that Wiedl and Herald violated his right to equal protection by failing to intervene in Meehan's sexual harassment or to properly investigate claims brought to their attention.  I conclude that plaintiff has a triable claim against Meehan but not the other defendants.

"[I]ndividuals have a constitutional right under the equal protection clause to be free from sex discrimination in public employment."  Annis v. Cty. of Westchester, N.Y., 36 F.3d 251, 254 (2d Cir. 1994) (citing Davis v. Passman,

442 U.S. 228, 234-35 (1979)). "[H]arassment that transcends coarse, hostile and boorish behavior can rise to the level of a constitutional tort." Id. (citing Gierlinger v. N.Y. State Police, 15 F.3d 32, 34 (2d Cir. 1994)).

"Section 1983 sexual harassment claims that are based on a 'hostile environment' theory, like [plaintiff]'s, are governed by traditional Title VII 'hostile environment' jurisprudence." Hayut v. State Univ. of N.Y., 352 F.3d 733, 744 (2d Cir. 2003); see also Kohutka v. Town of Hempstead, 994 F. Supp. 2d 305, 323 (E.D.N.Y. 2014) ("Because there are no clearly articulated standards in this Circuit with respect to hostile work environment claims under § 1983, [the Court] must look to Title VII for significant guidance." (quoting Dawson v. Cty. of Westchester, 351 F. Supp. 2d 176, 194 (S.D.N.Y. 2004)). Accordingly, there "must be evidence that the alleged discrimination was carried out because of sex." Hayut, 352 F.3d at 745.

In the case of same-sex harassment, the Supreme Court has provided the standard for demonstrating that discrimination occurred because of sex. See Oncale, 523 U.S. at 80. Workplace harassment is not "automatically discrimination because of sex merely because the words used

have sexual content or connotations"; rather, the inquiry must focus on "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Id. (citation omitted).

Oncale outlines three potential "evidentiary route[s]" for a plaintiff to demonstrate discrimination based on same-sex sexual harassment. Id. at 81. First, a plaintiff may show that the challenged conduct involved explicit or implicit proposals of sexual activity, motivated by sexual desire, which the harasser would not direct to someone of the opposite sex because the harasser is homosexual." Id. at 80. Second, a plaintiff may show that "the harasser [was] motivated by general hostility to the presence of" members of his or her sex "in the workplace." Id. Third, a plaintiff could "offer direct [comparative] evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." Id. at 80-81.

Plaintiff relies on the first and third of these evidentiary routes. As to the third, he cites a deposition that is not in the record. Accordingly, the issue is whether, the first route applies.[22] This is a difficult

_____

[22] Plaintiff also makes the conclusory argument that a female firefighter's complaints would have been taken more

47

question, which I resolve in plaintiff's favor.

### 1. Meehan

Meehan argues plaintiff cannot show that the alleged behaviors were directed at him based on his sex or were sufficiently severe or pervasive.  Alternatively, Meehan contends he is entitled to qualified immunity.  Finally, he raises a statute of limitations argument.  For reasons that follow, I think each argument is unavailing, except as to any pre-2003 behaviors, for which Meehan is entitled to qualified immunity.[23]

Meehan has testified he is heterosexual and argues he cannot have been motivated by sexual desire even if plaintiff's allegations are true.  But he repeatedly behaved towards plaintiff in ways a reasonable person could perceive as sexual, even after plaintiff asked him to stop. A reasonable jury could find, on the record before the Court, that Meehan's behavior was sexually motivated, notwithstanding his testimony to the contrary.

Plaintiff alleges numerous incidents when Meehan stroked or groped plaintiff's chest; rubbed his groin

---

seriously.  The record contains no evidence from which a reasonable jury could come to that conclusion.

[23] Meehan raises other arguments that are inapposite because they do not relate to a hostile work environment theory of liability.

against plaintiff's leg or buttocks; or attempted to grab plaintiff's groin. Meehan's "constant touching left [plaintiff] anxious around him." A reasonable jury could find that Meehan's actions constituted "conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." Id. at 82; e.g., Raspardo v. Carlone, 770 F.3d 97, 119 (2d Cir. 2014) ("We also cannot accept [defendant]'s contention that an objectively reasonable police officer would believe that this conduct was not clearly sexual harassment."). Whether these behaviors were sufficiently severe or pervasive to support a hostile work environment presents a triable issue of fact as to.

The Second Circuit's decision in Redd v. New York State Division of Parole is closely on point. See 678 F.3d at 169. In that Title VII case, the plaintiff alleged a female coworker touched her breasts on three occasions over approximately five months. On one occasion, the behavior occurred in front of another coworker. Id. at 179. The district court granted summary judgment, finding the conduct was not severe enough to create a hostile work environment and the evidence did not support an inference the coworker touched the plaintiff because she was a woman. Id. at 172. The Second Circuit reversed, citing numerous

factual disputes related to the severity of the behavior, and holding that "the interpretation of whether [the incidents] were accidental or not —- and whether or not they were because of Redd's sex -— were issues of fact for the jury to decide, not issues for the court to resolve as a matter of law." Id. at 181.

A jury might well find that Meehan's conduct was not motivated by sexual desire. But my role at this stage is not to resolve issues of fact one way or the other or try to predict what a jury will do; my role is limited to determining whether a factual issue is genuinely disputed so as to warrant submission to a jury. In making this assessment, I must view the evidence most favorably to the plaintiff and give him the benefit of all reasonable inferences.

At this stage of the litigation, Meehan also cannot sustain a qualified immunity defense with regard to sexually harassing actions after 2003. Qualified immunity protects government officials from § 1983 liability "unless the official's conduct violated a clearly established constitutional right." Pearson v. Callahan, 555 U.S. 223, 232 (2009). It has long been established in this Circuit that sexual harassment can constitute an equal protection violation. E.g., Annis, 36 F.3d at 254. It has also been

clear since at least 2003 that sexual harassment equal
protection § 1983 claims borrow standards from Title VII.
Hayut, 352 F.3d at 744; see also Shanes-Hernandez v.
Clementoni, 99 F.3d 402 (2d Cir. 1995) (unpublished
disposition) ("[B]ecause we find that the evidence was
sufficient to sustain a jury verdict for appellee for
sexual harassment under Title VII, we necessarily find that
the sexual harassment verdict was proper under the Equal
Protection Clause."); Petrosky v. N.Y. State Dep't of Motor
Vehicles, 72 F. Supp. 2d 39, 56 (N.D.N.Y. 1999) ("[T]he
legal standard which governs claims of sexual harassment
based on a hostile work environment under Title VII also
governs such claims asserted under . . . the Equal
Protection Clause." (citations omitted)).  And when Hayut
was decided, the Supreme Court had already made clear that
Title VII prohibited repeated, unwanted sexual contact,
including from a member of the same sex.  See Oncale, 523
U.S. at 75.  Accordingly, as of 2003, it was clearly
established in this Circuit that same-sex sexual harassment
could give rise to an equal protection claim under § 1983.[24]

---

[24] Courts in this Circuit cite Oncale in the equal
protection context.  E.g., Kalk v. Middaugh, 118 F. App'x
559, 560 (2d Cir. 2004); Munderville v. Highland Falls-Fort
Montgomery Cent. Sch. Dist., No. 06-CV-3156 (CS), 2008 WL
11424004, at *7 (S.D.N.Y. Dec. 15, 2008).  But cf. Snider
v. Jefferson State Cmty. Coll., 344 F.3d 1325, 1329 (11th

Meehan implicitly concedes in his briefing that Oncale supplies the relevant standard, arguing only that the evidence is insufficient to support a claim under Oncale.

Finally, Meehan argues that any acts before August 24, 2012 are barred by the statute of limitations. See Barile v. City of Hartford, 264 F. App'x 91, 91 (2d Cir. 2008) (noting three-year statute of limitations for § 1983 actions in Connecticut). But, under Morgan, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." 536 U.S. at 117; see also Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 79 (2d Cir. 2015) ("The considerations set forth by the Supreme Court in [Morgan] apply to § 1983 employment claims as well."). Plaintiff has testified to frequent touching by Meehan from the late 1990s until 2014. The conduct he describes is sufficiently similar to form a pattern that may properly be considered in its entirety.

2. Wiedl and Herald

Plaintiff alleges that Wiedl and Herald may be held

Cir. 2003) (holding that qualified immunity applied where it was not yet clear in the Eleventh Circuit whether same-sex sexual harassment was a violation of the Equal Protection Clause).

liable for their actions with regard to Meehan's sexual harassment in 2013 and 2014.[25]  Both Wiedl and Herald were present during the 2013 staff meeting when Meehan allegedly stroked plaintiff's chest, though both denied having seen this occur.  Herald instructed Wiedl to investigate the incident after plaintiff reported it to him.  Wiedl did so, and could not substantiate the allegations.  Neither Herald nor Wiedl reported the incident to HR.  When Rogers reported the 2014 humping incident to Wiedl and Herald, they both indicated they were aware of Meehan's propensity for touching plaintiff.  Plaintiff also reported the 2014 groping incident to Herald.  Herald and Wiedl, as Chief and Assistant Chief respectively at the time, had supervisory authority over Meehan and everyone else employed by the DFD.

Herald and Wiedl move for summary judgment based on qualified immunity.[26]  The qualified immunity analysis involves two questions: whether there was a violation of a

---

[25] At oral argument, plaintiff's counsel stated that this is plaintiff's only claim against Wiedl and Herald in their individual capacities.  Accordingly, other events such as the 2007 urination incident, 2009 threesome incident, 2012 or 2013 sex doll incident, and various facially neutral or racially discriminatory comments serve only as background evidence.

[26] They raise other arguments that are moot in light of plaintiff's concession narrowing the claims against Wiedl and Herald.

constitutional right and whether the right was "clearly established" at the time. Pearson, 555 U.S. at 232. On the evidence in the record, no reasonable jury could find that Wiedl or Herald's behavior violated plaintiff's constitutional rights.

"Individual liability under § 1983 in hostile work environment claims may . . . involve supervisory liability." Raspardo, 770 F.3d at 116. While there is no respondeat superior liability under § 1983, supervisors can be held responsible for their own conduct when it causes a hostile work environment.[27] Id. To hold a supervisor liable under § 1983, a plaintiff must show (1) "[t]he personal involvement of [the] supervisory defendant"; (2) "that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation"; and (3) "that a supervisor's behavior constituted intentional discrimination on the basis of a protected characteristic such as sex." Id. (citing Patterson, 375 F.3d at 226; Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002); Colon v.

---

[27] For this reason, "[i]n a § 1983 suit . . . the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009). In line with the Second Circuit, I use the term "supervisory liability," though with the understanding that this form of supervisory liability is limited.

Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).  In cases of
sexual harassment, liability may be appropriate under
§ 1983 when a supervisor "created an environment, or at
least permitted one to exist, in which the alleged
misconduct of various [employees] under his command
flourished and produced the harm of which the plaintiff
complained."  Gierlinger, 15 F.3d at 33.

With regard to Wiedl, plaintiff cannot satisfy the
third prong of this test.  Even if Wiedl's actions related
to Meehan's alleged sexual harassment constitute sufficient
personal involvement and proximately caused plaintiff's
injuries -- which is far from obvious, given that Wiedl
investigated the 2013 incident and reported his findings to
his superior -- plaintiff would need to show Wiedl
intentionally discriminated against him on the basis of
sex.  Two of the three evidentiary avenues for a plaintiff
to demonstrate discrimination based on same-sex sexual
harassment are closed to plaintiff; the other, sexual
desire, does not apply in this situation.  See Oncale, 523
U.S. at 79.

Nor is the claim saved by reference to sex
stereotyping.  Discrimination based on nonconformity with
sex stereotypes can support an equal protection claim.  See
Price Waterhouse, 490 U.S. at 250-51; Back v. Hastings On

Hudson Union Free Sch. Dist., 365 F.3d 107, 117-19 (2d Cir. 2004) (applying Price Waterhouse in the equal protection context). But there is no evidence that Wiedl discriminated against plaintiff in this way. No reasonable jury could find that Wiedl violated plaintiff's right to equal protection based on sex.

The claims against Herald have more merit. He was personally involved in that he made the decision not to report the 2013 nipple-stroking incident to HR. Had he done so, it is possible the 2014 incidents would have been prevented. It is not clear HR would have been able to substantiate the 2013 claim any more than Wiedl could. However, it is possible HR would have nonetheless ordered Meehan to attend EAP; this was their response to the 2014 leg-humping incident, notwithstanding their inability to corroborate that incident. Had HR investigated in 2013 and required Meehan to attend EAP at that time, Meehan's behaviors might have stopped then rather than continuing for another year. For purposes of this analysis, I will assume this is sufficient to demonstrate proximate cause. Cf. Poe, 282 F.3d at 140 ("[A]s a general proposition, [the alleged harasser's supervisor] may be found liable if, in supervising [the alleged harasser], he exhibited gross negligence or deliberate indifference to a high risk that

[the harasser] would violate [plaintiff]'s constitutional rights, and [the supervisor]'s neglect caused [the harasser] to violate [plaintiff]'s rights.").

As for the third prong, intentional discrimination, there is evidence in the record that a reasonable jury could construe as Herald stereotyping plaintiff as insufficiently masculine. For example, the urination incident when Herald exposed himself in front of the plaintiff may arguably reveal that Herald stereotyped plaintiff and sought to demean him on that basis. In addition, a jury could find that Herald failed to intervene appropriately after the 2013 incident because he was discriminating against plaintiff.

There is insufficient evidence, however, to support a finding that Herald created a hostile work environment for plaintiff such that he can be held individually liable. HR fully investigated the 2014 incidents after Herald's report. This leaves the urination incident, the reference to a threesome and the 2013 nipple-stroking occurrence. "Usually, a single isolated instance of harassment will not suffice to establish a hostile work environment unless it was 'extraordinarily severe.'" Howley, 217 F.3d at 153 (quoting Cruz, 202 F.3d at 570). The urination incident, the reference to a threesome, and Herald's decision to have

Wiedl investigate the 2013 nipple-stroking incident, rather than reporting the incident to HR, do not meet this standard.  Nor do they satisfy the pervasiveness standard. Accordingly, neither Wiedl nor Herald can be held liable for a constitutional violation.

C.  Disparate Treatment

Plaintiff alleges a single Title VII disparate treatment claim against the City: discrimination based on race, national origin, and sex when in 2006 Mark Omasta received the promotion to Training Officer instead of him.[28] The City is entitled to summary judgment on this claim as it is untimely.

Under Title VII, an aggrieved employee must file charges with the EEOC "within three hundred days after the alleged unlawful employment practice occurred" or within thirty days after receiving the CHRO's release of jurisdiction, whichever is earlier.  42 U.S.C. § 2000e-5(e)(1).  Accordingly, plaintiff's administrative filings in 2013 were well beyond the statute of limitations for occurrences in 2006.

Plaintiff argues that equitable tolling should apply.

---

[28] Plaintiff's responsive briefing acknowledges that other disparate treatment allegations in the Amended Complaint do not support a claim.

Equitable tolling is available in Title VII cases only when the failure to timely file is excusable because the plaintiff was "prevented in some extraordinary way from exercising his rights."  <u>Zerilli-Edelglass v. N.Y.C. Transit Auth.</u>, 333 F.3d 74, 80 (2d Cir.) <u>as amended</u> (July 29, 2003).  This can happen when a "plaintiff was unaware of his or her cause of action due to misleading conduct of the defendant."  <u>Id.</u>  For example, if "it would have been impossible for a reasonably prudent person to learn that an employment decision was discriminatory," equitable tolling might apply.  <u>Cerbone v. Int'l Ladies' Garment Workers' Union</u>, 768 F.2d 45, 49 (2d Cir. 1985) (internal brackets omitted).  Plaintiff makes no such allegation.

Plaintiff seeks equitable tolling on the grounds that he faced significant retribution after his 1996 CHRO claim and defendants have actively misled him by claiming to conduct meaningful investigations while failing to do so.  Neither ground supports equitable tolling here.  "A plaintiff['s] purported fear of retaliation by an employer, if they were to file an EEOC charge, is not a ground for equitable tolling of the Title VII statute of limitations." 45B Am. Jur. 2d <u>Job Discrimination</u> § 1167 (2019) (citing <u>Kirk v. Hitchcock Clinic</u>, 261 F.3d 75 (1st Cir. 2001); <u>Carter v. W. Publ'g Co.</u>, 225 F.3d 1258 (11th Cir. 2000));

see also Pietri v. N.Y. State Office of Court Admin., 936

F. Supp. 2d 120, 136 n.14 (E.D.N.Y. 2013) (collecting

cases).  As for plaintiff's claim the City misled him by

conducting inadequate investigations, plaintiff does not

explain how any such deception would be relevant to whether

he knew he had a possible cause of action.  According to

the record, the only complaint plaintiff made about the

2006 decision was to the Civil Service Commission.  If

plaintiff believed the Civil Service Commission was wrong

in its determination the City had committed no wrongdoing

in appointing Omasta, he had sufficient contemporaneous

awareness of his discrimination claim to foreclose

equitable tolling.  Accordingly, the disparate treatment

claim is time-barred.

   D.  *Monell* Liability

     Finally, plaintiff brings a § 1983 hostile work

environment claim against Mayor Boughton in his official

capacity.  A claim against an individual in his official

capacity is a claim against the municipality itself.  See

Burgis v. N.Y.C. Dep't of Sanitation, 798 F.3d 63, 70 n.8

(2d Cir. 2015) (citing Patterson, 375 F.3d at 226).

Municipalities may be subjected  to § 1983 liability in

accordance with the Supreme Court's decision in Monell v.

Department of Social Services of the City of New York, 436

U.S. 658 (1978).

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.' The first step in any such claim is to identify the specific constitutional right allegedly infringed." Albright v. Oliver, 510 U.S. 266, 271 (1994) (citation omitted). In this case, plaintiff alleges the City violated his right to equal protection by fostering a hostile work environment.[29]

The City may not be held liable for the acts of its employees under a theory of respondeat superior; it may be held liable only for its own wrongs. Cash v. Cty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011). "[I]n enacting § 1983, Congress did not intend to impose liability on a municipality unless deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." Bd. of the Cty. Comm'rs v. Brown, 520 U.S. 397, 400 (1997).

Thus, "plaintiff must prove that 'action pursuant to official municipal policy' caused the alleged

----

[29] Accordingly, the claim is not duplicative of plaintiff's Title VII claim against the City. "[A] plaintiff can assert a claim under Section 1983 if some law other than Title VII is the source of the right alleged to have been denied." Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 143 (2d Cir. 1993).

constitutional injury." Id. (quoting Connick v. Thompson, 563 U.S. 51, 60 (2011)).  More specifically, he must prove that (1) there existed an official policy or custom, (2) which caused him to be subjected to, 3) a deprivation of a constitutional right.  Musso v. City of New York, No. 05-CV-2511 (RRM), 2008 WL 3200208, at *4 (E.D.N.Y. July 24, 2008).

Four methods exist for demonstrating an official policy or custom.  Plaintiff may show

(1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive notice knowledge of policy-making officials; or (4) a failure by official policy makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

Albert v. City of Hartford, 529 F. Supp. 2d 311, 329 (D. Conn. 2007) (citations and internal brackets omitted).

Plaintiff alleges he can demonstrate a policy or custom under the third and fourth theories.  He argues that the Mayor was aware of the DFD's history of racial discrimination and had actual knowledge of four of plaintiff's complaints (the 1996 Union grievance and CHRO complaint; the 2013 CHRO complaint; and the 2014 HR investigation into the leg-humping incident), yet failed to

meaningfully investigate complaints or discipline harassers.

Plaintiff's argument under both theories is unavailing. Regarding the fourth avenue, his argument that the Mayor has so thoroughly failed to remedy discriminatory behavior that the City can be held liable is unsupported. Moreover, as shown by evidence in the record, the City has promulgated an antiharassment policy and has undertaken to investigate and remedy discriminatory conduct.

The third avenue requires establishing a "custom or usage" that becomes a de facto policy. Plaintiff cites the claims of other individuals, largely from other City departments, in an attempt to show that the City is aware of past discrimination and, by failing to remedy it, has adopted a policy of unconstitutional behavior. But plaintiff makes no effort to detail how that other evidence is relevant to his case; for example, he does not explain why the complaint of a female firefighter regarding sexual harassment by a male firefighter is relevant to his complaint of sexual harassment by Meehan.[30] Moreover, he

---

[30] In 1983, the City was enjoined from using a certain appointment method -- which involved giving "preference points" to members of volunteer fire companies -- on the basis it was discriminatory. <u>Gavagan v. Danbury Civil Serv. Comm'n</u>, No. B-82-307, 1983 WL 510, at *9 (D. Conn. Feb. 4, 1983). However, plaintiff's hostile work

does not attempt to demonstrate how those other complaints support a finding of unconstitutional behavior.  The mere filing of a complaint does not prove a constitutional violation.

Plaintiff alleges that the City failed to react appropriately to the hostile work environment he was experiencing.  Cf. Matusick v. Erie Cty. Water Auth., 757 F.3d 31, 62-63 (2d Cir. 2014).  I have already found on similar grounds that plaintiff's Title VII claim against the City may proceed in part.  It does not follow, however, that the Monell claim also should be allowed to proceed. E.g., Payne v. N.Y.C. Police Dep't, 863 F. Supp. 2d 169, 189 (E.D.N.Y. 2012) (granting summary judgment to defendant on plaintiff's Monell claim while allowing a Title VII hostile work environment claim to proceed and finding these holdings "not inconsistent" because "[p]laintiff has not offered evidence that the conduct alleged in support of his

_____

environment claim is not based on an argument the City inappropriately awarded preference points.  Separately, plaintiff makes much of a 1995 case brought by a former firefighter for sexual orientation discrimination, which the court dismissed under then-existing precedent.  David v. Local 801, Danbury Fire Fighters Ass'n, 899 F. Supp. 78, 80 (D. Conn. 1995).  He argues that his peers' awareness of this case explains the shift from racially charged to homophobic taunts.  Even if that is so, the case cannot help plaintiff's Monell claim because the David court did not find that the City had committed a constitutional violation.

Title VII claims was pursuant to custom or usage with the force of law"). A Title VII hostile work environment claim can be supported when, as here, many individual instances of discrimination can be imputed to the City and comprise a single violation. A <u>Monell</u> claim requires more: there must be evidence from which a jury could infer that this violation was part of a deliberate policy on the part of the City. Plaintiff's evidence is insufficient to support that inference. <u>Cf.</u> <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 822 (1985) ("[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault . . . and the causal connection between the 'policy' and the constitutional deprivation."), <u>abrogated in part on other grounds by</u> <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 477 n.5, 480–81 (1986); Martin A. Schwartz, <u>Section 1983 Litigation:</u> <u>Claims and Defenses</u> 7-52 (4th ed. 2015 & Supp. 2019) ("To establish § 1983 municipal liability, the plaintiff must establish (1) a violation of a federal right that is (2) attributable to enforcement of a municipal policy or practice. These are separate issues and plaintiff must satisfy each requirement in order to establish § 1983 municipal liability."

For this claim to survive, plaintiff must show that the City was on notice of a constitutional violation. He cites the 1996 Union grievance and CHRO complaint, the 2013 CHRO complaint, and the 2014 HR investigation. The 1996 grievance and complaint pertained to discrete acts rather than to a hostile work environment. The 2014 investigation was sufficient, and no related incidents followed it. Finally, the record does not reveal any complaints following the 2013 CHRO complaint that related to the substance of the CHRO complaint yet were not investigated. Given this history, plaintiff's Monell claim may not proceed.

IV. Conclusion

Accordingly, the City's motion is granted in part and denied in part as to the claims under Title VII and granted as to the Monell claim; Meehan's motion is denied, except to the extent that he is entitled to qualified immunity for acts prior to 2003; and the motion submitted by Wiedl and Herald is granted.

So ordered this 30th day of September 2019.


_____/s/ RNC_____
Robert N. Chatigny
United States District Judge